# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| **In re** | |
| **JULIANN O'DONNELL,** | **Chapter 7** |
| **Debtor** | **Case No. 12-10038-FJB** |
| **ASSOCIATED RECEIVABLES FUNDING, INC.,** | |
| **Plaintiff** | |
| **v.** | **Adversary Proceeding** |
| | **No. 12-1146** |
| **JULIANN O'DONNELL,** | |
| **Defendant** | |

## MEMORANDUM OF DECISION

### I.  Overview and Procedural History

On January 4, 2012, the defendant and chapter 7 debtor, Juliann O'Donnell ("Juliann") filed a voluntary petition under chapter 7 of the Bankruptcy Code, commencing the present bankruptcy case. On June 8, 2012, the plaintiff, Associated Receivables Funding, Inc. ("ARF"), timely filed the complaint commencing this adversary proceeding. By its complaint, ARF seeks a determination that debts owed to it by Juliann are excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), and (a)(6). Additionally, by its complaint, ARF objects under 11 U.S.C. §§ 727(a)(2) and (a)(5) to entry of a discharge in favor of Juliann.

The parties tried this matter over two days. After trial, the parties submitted proposed findings and rulings and made closing arguments before the Court. The Court now makes the following findings and rulings and on the basis thereof, concludes that Juliann shall be denied a discharge. Further, for the

reasons articulated in this memorandum, the Court concludes that should any discharge enter, notwithstanding the Court's denial of Juliann's discharge, any amounts owed to ARF with respect to the transactions discussed below are excepted from discharge.

II.    **Findings of Fact**

A.    **Grove Electronics**

Grove Electronics, LLC d/b/a Chip Partners ("Grove") was a limited liability company organized under Massachusetts law and engaged in the business of purchasing and reselling computer parts on a wholesale basis.  Juliann and her husband, Brian O'Donnell ("Brian"), owned and operated Grove.  Brian owned a ninety-five percent interest in Grove while Juliann owned a five percent interest.  Juliann worked at Grove from 2004 until 2010 when the Company ceased operations.  For the entire period of her employment at Grove, Juliann maintained all of Grove's accounts receivable and accounts payable records.  Juliann also made deposits for Grove, managed Grove's QuickBooks system, and helped manage Grove's "CORtracker" system through which Grove's sales and shipments were processed. Juliann also maintained contact with Grove's customers and creditors.

B.    **The Factoring Arrangement**

Beginning in 2009, Grove experienced a steady decline in business.  Grove sustained a net loss of $785,498 for the calendar year 2009.  During this same period, Grove experienced a cash flow shortage. As Juliann admitted at trial, cash was "tight" during this period.

Due to its cash flow issues, Grove entered into an accounts receivable financing agreement with ARF in July 2009.  Under the resulting accounts receivable financing arrangement (also referred to as a factoring arrangement), Grove agreed to assign its rights to receive payment from its customers to ARF in exchange for immediate upfront payments from ARF.  Juliann and Brian both executed a personal guaranty agreement in which they each agreed to be held jointly and severally liable for all such

obligations.  Additionally, the agreement provided ARF with a first priority security interest in all

receivables generated by Grove, as well as any products returned to Grove.

In the course of selling shipments of computer parts, Grove generated customer invoices which

embodied Grove's rights to receive payment from its customers.  In order to assign these invoices to

ARF, an authorized Grove signer would stamp the physical invoices with a special stamp provided by ARF

("ARF Assignment Stamp").  The authorized Grove signer would then sign the stamped invoices and

submit them to ARF for funding.  The only authorized Grove signers were Juliann and Brian.  The ARF

Assignment Stamp contained the following representations:

> For value received, we hereby assign and transfer this invoice and its proceeds to
> Associated Receivables Funding, Inc., who is the owner of this invoice unencumbered by
> any other security or claims, and pursuant to the master agreement.  The undersigned
> does herewith assign all lien rights, chooses [sic] in action, chattel paper or contract
> rights.  We further clarify that the goods have been shipped and/or services have been
> rendered in agreement with all terms and conditions.

Upon receipt of stamped Grove Invoices and certain supplemental documentation, collectively

referred to as "funding packages," ARF would take possession of the invoices and remit immediate

payments to Grove.  ARF would then proceed to collect the invoice amounts directly from Grove's

customers.

C.      The Flextronics Invoice

Grove's primary customer was Flextronics America, LLC ("Flextronics"), to which Grove sold

various bulk shipments of computer parts, including bulk shipments of liquid-crystal-display panels ("LCD

panels") to be used in computer monitors.  Sales to Flextronics constituted a major portion of Grove's

overall sales.

On March 4, 2010, Grove issued an invoice to Flextronics ("Flextronics Invoice") in the amount

of $102,690 for an order of 1,260 LCD panels. The Flextronics Invoice references a UPS tracking number

indicating that that the order was shipped on March 4, 2010.  Grove's internal shipping documentation,

however, contains no indication that the order referenced in the Flextronics Invoice was shipped on

March 4.  Bob Booth ("Booth"), a Grove employee, maintained a daily shipping report ("Daily Sales Order Schedule") that catalogued the orders Grove shipped on a given day.  Booth e-mailed the Daily Sales Order Schedule to Grove staff, including Juliann, on a daily basis.  The Daily Sales Order Schedule e-mailed to Juliann and other Grove staff after the close of business on March 4, 2010 does not list the order referenced in the Flextronics Invoice with the orders Grove shipped that day.

At some point between the night of March 4 and the morning of March 5, 2010, Grove submitted the Flextronics Invoice to ARF stamped with the ARF Assignment Stamp and signed by Brian.  Grove also submitted to ARF: a purchase order from Flextronics for the 1,260 LCD panels, a bill of lading from UPS indicating that a pallet of "electronic components" had been shipped on March 4, and a printout of an online UPS tracking page indicating that a package had been shipped on March 4.  There is a discrepancy between the two UPS documents in that the bill of lading refers to a pallet of electronic components weighing 375 pounds while the printout of the online UPS tracking page references a shipment weighing 575 pounds.

 On March 5, 2010 at 6:07 A.M., Juliann sent an e-mail to Stephanie Moses Tickle ("Tickle"), the ARF account manager assigned to manage the Grove receivables.  Juliann's e-mail contained the subject line, "2 packages sent overnight" and stated in part:

> Brian sent you a package for funding and did not copy what he sent.  (I keep a copy of everything I send in case Fedex loses the package, etc…) Can you either scan or fax a copy of the package he sent.  [. . .] Also, if you are in need of packing slips, I will send them to you today.

Tickle responded to Juliann's e-mail by asking that Juliann send Grove's internal packing slips for the orders sent on March 4.  Juliann responded with a subsequent e-mail to which she attached PDF files of multiple packing slips including one corresponding to the order referenced in the Flextronics Invoice.  Juliann and Tickle had an additional e-mail exchange on March 5, in which Juliann provided wiring instructions for various payments from ARF including the payment for the Flextronics Invoice.

4

The Flextronics Invoice and accompanying documents were sent to ARF for the purpose of inducing ARF to rely upon the information contained therein and to fund the Flextronics Invoice.  Additionally, Juliann's subsequent communications with Tickle, ARF's account manager for the Grove account, were made for the purpose of inducing ARF to rely on the information she conveyed and to fund the Flextronics Invoice.  ARF did rely on the Flextronics Invoice, the accompanying documentation, and Juliann's subsequent communications.  ARF funded the Flextronics Invoice in accordance with the factoring agreement by wiring payments either to Grove or to Grove's creditors as requested by Juliann in her March 5 e-mail exchange with Tickle.  The precise amount of funds advanced by ARF to Grove was not entered into evidence.

On March 9, 2010, Juliann sent an e-mail to Tickle confirming that Grove had submitted the Flextronics Invoice to the Flextronics electronic vendor portal.

On April 15, 2010, Juliann received an e-mail inquiry about the Flextronics Invoice from Michelle Westmoreland ("Westmoreland"), a Flextronics employee whose duties included procuring shipments of computer parts from suppliers such as Grove.  In her e-mail to Juliann, Westmoreland explained that the accounts payable group at Flextronics had blocked payment of the Flextronics Invoice because Flextronics had never received the shipment of LCD panels referenced in the invoice.  Juliann responded via e-mail the same day and stated that the Flextronics Invoice had been sent to Flextronics by mistake.  Westmoreland followed up in a subsequent e-mail asking, "[S]o we really do not owe this invoice correct?  Will you be sending a [credit memo] or just void it out on your end?"  Juliann responded, on April 16, that Westmoreland could "void out" the invoice, thus indicating that Flextronics had no obligation to pay the Flextronics Invoice.  This was despite the fact that Grove had already assigned the Flextronics Invoice to ARF and had already received funding from ARF in exchange for the

assignment.  Juliann made no attempt to contact ARF regarding her exchange with

Westmoreland.

May 25, 2010 marks the first attempt by anyone at Grove to inform ARF that Flextronics

would not be paying the Flextronics Invoice.  On this date, Brian sent an e-mail to Gordon Farr

("Farr"), an ARF employee, who forwarded the e-mail to Kevin Gilbert ("Gilbert"), ARF's

Executive Vice President.  Brian's e-mail to Farr stated that Flextronics *had received* the goods

referenced in the Flextronics Invoice, but also that Flextronics had subsequently canceled the

purchase order and returned the goods to Grove.  Brian's e-mail further stated that, under the

terms of the purchasing agreement, Flextronics was entitled to cancel its purchase order and

return the goods without compensating Grove.  Brian's e-mail is directly contradicted by the

April e-mail exchange between Westmoreland and Juliann in which Westmoreland states that

Flextronics never received the goods and Juliann states that the invoice was sent by mistake and

could be "voided out."

After receiving Brian's e-mail, Gilbert, ARF's Executive Vice President, sent an ARF

employee directly to Grove's warehouse to "personally identify and confirm that the goods that

were being returned by Flextronics represented in [Brian's] e-mail were truly there and being

kept."  Around late May 2010, Gilbert sent Courtney Moore ("Moore"), ARF's Regional Vice-

President, to Grove's location in North Reading, Massachusetts.  When Moore arrived at the

Grove facility, Brian took her into Grove's warehouse but was unable to locate the goods in

question.  Brian informed Moore that "another gentleman was coming in later that takes care of

the warehouse and that as soon as he got in, that they'd call [Moore] since [her] office was

down the road and [she] could come back once the merchandise was found and take a look at

it."  Moore left and waited for a phone call from Grove.

Moore never received a call from anyone at Grove.  At some point during the following two days, Moore returned to Grove, this time only to find a vacant facility.  As Moore testified at trial, "no one was there and all the shades were drawn and it was vacant."  Moore received no further communication from Brian, Juliann, or anyone else at Grove.  Moore reported the above facts to Gilbert at ARF.

After learning of Moore's unsuccessful attempt to verify that the LCD panels had been returned to Grove, Gilbert attempted to contact Flextronics directly.  In June 2010, Gilbert contacted Westmoreland at Flextronics via e-mail regarding the Flextronics Invoice.  Westmoreland explained that Flextronics had never received the shipment referenced in the invoice.  She forwarded to Gilbert the April e-mail exchange in which Juliann confirmed that Flextronics did not owe any obligation in regard to the Flextronics Invoice.

ARF never received payment on the Flextronics Invoice.  The LCD panels referenced in the Flextronics Invoice were never located.

Juliann maintains that the LCD panels were shipped to Flextronics and then returned to Grove by Flextronics.  She further maintains that Valenti Electronics, a scrap company Grove had hired to remove items from its warehouse, mistakenly disposed of the LCD panels.  Juliann provides no evidence to support this account.  Further, this account is directly contradicted by Juliann's own April 2010 e-mails in which she informed Flextronics employee Westmoreland that the Flextronics Invoice was a mistake and that it did not have to be paid.  Accordingly, I do not credit Juliann's account on this point.  I find instead that the goods referenced in the Flextronics Invoice were never shipped.  Further, I find that all of the representations to ARF, on the part of Juliann, Brian, and Grove, that the goods referenced in the Flextronics Invoice had been shipped, were false.

D.      **The Arrow Invoices**

On May 10, 2010, Arrow Electronics ("Arrow"), another Grove customer, submitted a purchase order ("Arrow Purchase Order") to Grove for 300 units of a specific Intel computer part.  Heather Martin ("Martin"), one of several Arrow employees charged with purchasing computer parts, e-mailed the Arrow Purchase Order to Steve Baker ("Baker") at Grove along with a request to confirm Grove's receipt of the order.  Martin never received a response from Baker or from anyone else at Grove confirming receipt of the purchase order.

On June 17, 2010, Grove issued an invoice to Arrow ("First Arrow Invoice") in the amount of $19,700 for 200 units of the Intel part requested in Arrow Purchase Order.  On June 24, 2010, Grove issued a second invoice to Arrow ("Second Arrow Invoice") this time in the amount of $9,850 for 100 units of the requested Intel part.  Both invoices were forwarded to ARF for funding.  Both invoices were stamped with the ARF Assignment Stamp and signed by Juliann.  As noted above, the ARF Assignment Stamp contains a representation that the goods referenced in the stamped invoice have been shipped.  ARF relied on the representations contained on the stamped Arrow invoices that Grove had shipped the goods question to Arrow.  ARF funded both invoices.  The precise amount of funds advanced by ARF to Grove was not entered into evidence.

At some point prior to June 28, 2010, Arrow received a shipment from Grove accompanied by a packing slip which stated that the shipment contained 200 units of the Intel part requested in the Arrow Purchase Order.  When Arrow employees opened the shipment, however, they discovered that the shipment contained only twenty units of an incorrect computer part and no units of the requested Intel part.  Upon learning that the Grove shipment contained the incorrect computer part, Martin, who had been unable to contact anyone at Grove since she sent the Arrow Purchase Order on May 10, renewed her efforts to contact Grove, now to obtain authorization to return the incorrect shipment.  When she was unable to reach anyone at Grove, Martin "closed" the purchase order within Arrow, meaning she

informed Arrow's accounts payable department not to pay Grove for the requested parts and she

attempted to obtain the Intel parts from a new supplier.

Martin was never able to reach anyone at Grove.  The only shipment Arrow received from Grove

related to the Arrow Purchase Order was the above referenced incorrect shipment.   Arrow never

received the requested Intel parts.  Accordingly, Arrow never paid any money to either Grove or ARF

with respect to either the First Arrow Invoice or the Second Arrow Invoice.  ARF has never received

payment for either of the two Arrow invoices that it funded.  I find that the goods referenced in the two

Arrow invoices were never shipped by Grove.   Further, I find that Juliann's representations to ARF, that

the goods referenced in the two Arrow invoices had been shipped, were false.

### E.        The NEI Invoice

On June 15, 2010, Grove issued an invoice to Network Engines, Inc. ("NEI") in the amount of

$4,573 ("NEI Invoice").  On June 15, 2010, Grove forwarded the NEI Invoice to ARF for funding.  The NEI

Invoice was stamped with the ARF Assignment Stamp and signed by Juliann.  ARF relied on the

representations contained on the stamped invoice and remitted a payment to Grove in exchange for the

assignment.

At some point after Grove assigned the NEI Invoice, NEI paid the $4,573 directly to Grove rather

than to ARF.  Instead of forwarding the funds to ARF, Juliann deposited the funds into one of Grove's

checking accounts.  Juliann did this in spite of her knowledge that the NEI Invoice had been assigned to

ARF and that the funds rightfully belonged to ARF.   Neither Juliann nor anyone else from Grove ever

forwarded the funds to ARF.

ARF subsequently brought suit against NEI to collect on the NEI Invoice.  ARF and NEI have since

reached a settlement.

### F.      Grove Ceases Operations

Grove's business continued to decline throughout 2010 as Flextronics, Grove's primary customer, increasingly purchased parts from competing vendors.  Grove sustained a net loss of $1,538,021 in 2010.  By June 30, 2010, Grove laid off all of its employees other than Brian and Juliann.  On September 12, 2010, Grove completed its final transaction.  Grove's bank statements reveal that all three of Grove's corporate checking accounts had balances at or near zero by the beginning of September 2010.  By the end of September, all three accounts had either a negative or zero balance.

### G.      The State Court Lawsuit and the Tax Return

When Gilbert at ARF learned about the extent of the problems with the Flextronics Invoice, the First Arrow Invoice, and the Second Arrow Invoice, he contacted counsel to commence suit against Grove, as well as against Juliann and Brian based on their personal guarantees of the factoring agreement.  On September 2, 2010, ARF commenced suit against Grove, Juliann, and Brian in the Middlesex County Superior Court.  As part of its suit, ARF sought to enjoin Juliann and Brian from spending or otherwise disposing of a large tax refund which they were about to receive totaling approximately $100,000.  On September 7, 2010, the Superior Court issued a temporary restraining order which prohibited Juliann and Brian from depositing, spending, or dissipating any funds received by them concerning the tax refund at issue.

In a September 16, 2010 hearing, Juliann and Brian opposed the restraining order.  In filing their oppositions, Juliann and Brian each executed an affidavit which was filed with the Superior Court.  The affidavits were filed so that the Superior Court judge would rely on the representations contained therein in deciding whether or not to release the funds representing the tax refund.

In Brian's affidavit, he stated that the goods referenced in the Flextronics Invoice had been returned to Grove and that he had notified ARF of the return of said goods as soon as he learned about it in May 2010.  He also stated that the goods had been stored in the Grove warehouse and that he

10

believed that a scrap company had mistakenly removed the goods.  Additionally, Brian explained that he and Juliann needed the tax refund money to keep the business going and to prevent "the loss of employment of [their] non-family employee."  This was despite the fact that Grove had laid off all its employees by the end of June.

In Juliann's affidavit, Juliann stated that she had read Brian's affidavit and "believe[d] every line of it to be true."  She also stated that Grove "never knowingly or intentionally violated any term of [its] contract with [ARF]," and that she, Brian, and Grove had "always been proactive in informing [ARF] about product returns."  Juliann repeated Brian's statements about their need for the tax refund money, stating:

> The tax refund is of vital importance to Grove and my husband and I personally.  Unless we have access to these funds to pay other creditors and fund continuing operations, we will probably have to go out of business.  That will lead to the loss of employment of our non-family employee[.]

Juliann made these representations despite the facts that Grove had laid off its last employee in June, that Grove had completed its last customer transaction days before the September 16 hearing, and that all three of Grove's corporate checking accounts were at or near zero by the beginning of September.

At the conclusion of the hearing, the Superior Court issued an order vacating the temporary restraining order and denying ARF's request for a more permanent injunction related to the tax return.  In a clarifying order, the Court specifically made a finding that it was in the best interest of both parties that Grove remain open.

On September 16, 2010, the same day on which the Court vacated the temporary restraining order, Juliann and Brian received a tax refund totaling $99,190.37.  This entire amount was deposited into Juliann's personal checking account which had a prior balance of only $92.75.  Juliann's bank statements indicate that a check for $51,431.49 was issued from this account on September 23, 2010.  The bank statements do not indicate to whom this check was written.

### H.      Grove's Chapter 7 Bankruptcy

On December 30, 2010, Grove filed in this Court a voluntary petition for relief under chapter 7 of

the Bankruptcy Code, commencing Grove's bankruptcy case ("Grove Bankruptcy Case").  Grove filed its

bankruptcy schedules on February 1, 2011.  Grove's Statement of Financial Affairs indicates that Grove

ceased operations in September 2010.  On February 3, 2011, an initial meeting of creditors was

conducted pursuant to 11 U.S.C. § 341 ("341 Meeting").  At the 341 Meeting, Juliann and Brian were

questioned about the tax refund.  The Chapter 7 trustee requested that Juliann produce an accounting

as to the disposition of the funds representing the tax refund.  In response, Juliann produced a

spreadsheet ("Tax Refund Accounting") detailing how the money had been spent.  Juliann's Tax Refund

Accounting failed to account for the $51,431.49 check issued on September 23, 2010.

The Chapter 7 Trustee filed a Report of No Distribution on March 23, 2011, and the Grove

Bankruptcy Case was closed on May 3, 2011.

### I.      Juliann's Chapter 7 Bankruptcy

On January 4, 2012, Juliann filed a voluntary petition under Chapter 7 of the Bankruptcy Code.

On June 8, 2012, ARF filed the complaint commencing this adversary proceeding.

In the course of discovery for the present adversary proceeding, ARF requested that Juliann

produce copies of her bank statements and copies of various checks, including the above referenced

$51,431.49 check.  Juliann did produce her bank statements, but responded in writing to the request for

check copies by stating that the checks were, "Not in custody, possession or control."  At a deposition on

September 11, 2013, counsel to ARF questioned Juliann about the $51,431.49 check.  Juliann provided

no explanation.

The parties tried this adversary proceeding over two days in March 2014.  When questioned at

trial by ARF's counsel regarding the unaccounted for check, Juliann again provided no explanation,

testifying as follows:

Q.     And today, you still don't know what the money was for, correct?

A.     No, I don't off –

Q.     Okay.

A.     Today I don't know.

Notwithstanding the commencement of suit by ARF against Grove, Juliann, and Brian, I have no

evidence that this suit went to completion or that ARF obtained a judgment against Juliann.

## II.     Jurisdiction

The matters before the court are a proceeding under 11 U.S.C. § 523(a) to determine the

dischargeability of a debt and another under 11 U.S.C. § 727(a) to object to discharge.  The matters arise

under the Bankruptcy Code and in a bankruptcy case and therefore fall within the jurisdiction given the

district court in 28 U.S.C. § 1334(b) and, by standing order of reference, referred to the bankruptcy court

pursuant to 28 U.S.C. § 157(a).  Both are core proceedings.  28 U.S.C. § 157(b)(2)(I) and (J) (core

proceedings include determinations as to the dischargeability of particular debts and objections to

discharge).  This court accordingly has authority to enter final judgment as to both matters.  28 U.S.C. §

157(b)(1).

## III.    Discussion

### A.     Preliminary Matters Regarding the § 523(a) Counts

The party seeking to except a debt from discharge bears the burden of proving each element by

a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 291 (1991).  In furtherance of the

Bankruptcy Code's 'fresh start' policy, exceptions to discharge are narrowly construed.  *Palmacci v.

Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997).

ARF seeks a determination that the debts owed to it by Juliann in connection with the

Flextronics and Arrow transactions are excepted from discharge under § 523(a)(2)(A) as debts arising

from false pretenses, a false representation, or actual fraud *and* under § 523(a)(2)(B) as debts obtained

13

by use of a statement in writing that is materially false.  ARF alleges that the actual written invoices are both false representations under § 523(a)(2)(A) and materially false statements in writing under § 523(a)(2)(B). Subsections (a)(2)(A) and (a)(2)(B), however, are mutually exclusive.  *In re Cajigas*, 514 B.R. 61, 66 (1st Cir. BAP 2014) (*citations omitted*).  As a preliminary matter, the Court notes that although the invoices in question are statements in writing, they do not concern "the debtor's or an insider's financial condition" within the meaning of 11 U.S.C. § 523(a)(2)(B), and therefore (i) cannot be cause for exception from discharge under (a)(2)(B) and (ii) are appropriately considered under § 523(a)(2)(A).

The language of § 523(a)(2)(A) expressly excludes any statement "respecting the debtor's or an insider's financial condition."  Within § 523(a)(2), the special case of statements respecting the debtor's or an insider's financial condition is governed by subsection (a)(2)(B), which subjects such statements to different requirements for exception from discharge.  The Bankruptcy Code does not define "statement respecting financial condition," and there is disagreement among courts about the breadth of this term. *See In re Cajigas*, 514 B.R at 67; *In re Kosinski*, 424 B.R. 599, 609–610 (BAP 1st Cir.2010) (*collecting cases*).  The District Court recently described the disagreement as split between courts that hold that "a communication addressing the status of a single asset or liability qualifies as respecting the debtor's [...] financial condition" and courts that find that "only statements which relate to a debtor or insider's overall financial health are to be considered, though these documents need not be restricted to formal financial statements." *Follo v. Morency*, 507 B.R. 421, 429 (D. Mass. 2014).

While the First Circuit has not yet addressed this issue, I have previously construed the language of § 523(a)(2)(B) to require an accounting of an entity's overall financial health akin to a balance sheet or income statement, not a mere statement as to a single asset or liability.  *See In re Alexander*, 427 B.R. 183, 194 (Bankr. D. Mass. 2010); *In re Stinson*, WL 359917, at *5 (Bankr. D. Mass. Feb. 2, 2012).  The invoices in question each reflect the value of a single right to payment rather than provide an overall picture of Grove's financial well-being.  Accordingly, the invoices are not statements "respecting the

14

debtor's or an insider's financial condition" within the meaning of § 523(a)(2)(B), and the Court will

consider them as cause for exception from discharge only under § 523(a)(2)(A).

### B.     11 U.S.C. § 523(a)(2)(A)

### i.     Applicable Law

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for money,

property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false

pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A).  In order to establish that a

debt is nondischargeable under § 523(a)(2)(A) due to a false representation, the plaintiff must prove

each of the following elements by a preponderance of the evidence: "1) the debtor made a knowingly

false representation or one made in reckless disregard of the truth; 2) the debtor intended to deceive; 3)

the debtor intended to induce the creditor to rely upon the false statement; 4) the creditor actually

relied upon the misrepresentation; 5) the creditor's reliance was justifiable; and 6) the reliance upon the

false statement caused damage." *McCrory v. Spigel* (*In re Spigel*), 260 F.3d 27, 32 (1st Cir. 2001), citing

*Palmacci*, 121 F.3d at 786.

The first element, making a knowingly false representation, refers to the conduct of the debtor

and can include a debtor's promise to act, "[i]f, at the time he made his promise, the debtor did not

*intend to perform*[.]" *Palmacci*, 121 F.3d at 786-87.  The second element, intent to deceive, refers to the

Debtor's mental state and specifically requires a mental state embracing an intent to deceive,

manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380–81, 47

L.Ed.2d 668 (1976); *Palmacci*, 121 F.3d at 786-87.  Intent to deceive may be demonstrated by showing

that "a false representation has been made . . . recklessly, careless of whether it is true or false," or, in

other words, with reckless disregard for the truth.  *Palmacci*, 121 F.3d at 787 (*citations omitted*).

"Availability of direct evidence to prove a debtor's intent to deceive a creditor is unlikely to be obtained.

The court may infer fraudulent intent from the totality of circumstances*." Danvers Savings Bank*, 427

B.R. at 195, citing *Palmacci*, 121 F.3d at 789. Among the circumstances from which scienter may be

inferred are: the defendant's insolvency or some other reason to know that he cannot pay, his

repudiation of the promise soon after made, or his failure even to attempt any performance. *Palmacci*,

121 F.3d at 789. Although the inquiries are distinct, in many cases the same factors show both the

debtor's knowledge or recklessness as to the falsity of his representation and his intent to deceive. *Faria*

*v. Silva (In re Silva)*, 2014 WL 217889 at *5 (Bankr. D. Mass. Jan. 21, 2014), citing *Bellas Pavers, LLC v.*

*Stewart (In re Stewart),* MB 12–017, 2012 WL 5189048 at *8 n. 4 (B.A.P. 1st Cir. Oct. 18, 2012).

The final four elements embody the requirement that the creditor's claim must arise directly

from the debtor's fraud. *Faria*, 2014 WL 217889 at *5, citing *McCrory*, 260 F.3d at 32. As to the

creditor's reliance, the Supreme Court of the United States has held that § 523(a)(2)(A) requires only

justifiable reliance—a lower standard than reasonableness. *Field v. Mans,* 516 U.S. 59, 70 (1995).

Reliance is justifiable if the falsity of the representation would not have been readily apparent to the

person to whom it was made. *Id.* at 70-72. For purposes of determining whether reliance was justified,

"the circumstances of the reliance claim must be taken into account," and "the individual is not obliged

to investigate statements made to him (although he cannot shut his eyes to an obvious falsehood)."

*Lentz v. Spadoni* (*In re Spadoni*), 316 F.3d 56, 59 (1st Cir.2003).

ii.    **Analysis**

ARF asserts that Juliann made false representations to ARF in connection with the Flextronics

Invoice and the two Arrow Invoices on which ARF justifiably relied when it forward funds to Grove.

While no evidence was offered to show that Juliann created or signed the Flextronics Invoice itself,

Juliann's subsequent communications with ARF regarding the Flextronics Invoice meet the elements of §

523(a)(2)(A). Additionally, the two Arrow Invoices, which Juliann signed and stamped with the

representations that the goods in question had been shipped, meet the elements of 523(a)(2)(A).

16

On the basis of the findings of fact set forth above, I find by a preponderance of the evidence that Juliann made the following false representations to ARF: Juliann falsely represented to ARF that Grove had shipped the LCD panels referenced in the Flextronics Invoice when she e-mailed wiring instructions and a PDF file of a packing slip indicating said shipment to Stephanie Tickle, one of ARF's account managers. Additionally, Juliann falsely represented to ARF that Grove had shipped the Intel computer parts referenced in the two Arrow Invoices when she signed and stamped the two Arrow Invoices submitted to ARF for funding.

Further, I find that Juliann made these representations with the knowledge that they were false and with the subjective intent to deceive ARF. As noted above, the finder of fact may infer the debtor's knowledge as to the falsity of her representations as well as her intent to deceive from the totality of the circumstances. An examination of Juliann's dealings with ARF reveals that, on multiple occasions, Juliann represented to ARF that Grove had shipped goods referenced in assigned invoices and then made no attempt to correct these representations even after Grove's customers notified or attempted to notify Grove that they had not received the goods in question. Grove having already received payment from ARF on these invoices, Juliann made no attempt to inform ARF of these problems. From these circumstances and from Juliann's overall pattern of conduct, as set out in the findings above and as emphasized below, I infer that Juliann knew that Grove had not shipped the goods in question when she represented otherwise and that she made these false representations with the intent to deceive ARF.

With respect to Juliann's communications with ARF regarding the Flextronics Invoice on March 5, 2010, Juliann had notice that her representations were false by virtue of Grove's own internal shipping records. Grove's Internal Daily Sales Order Schedule for March 4, which Juliann had received via e-mail, contained no record of the Flextronics Invoice shipment. Further, Juliann's subsequent behavior provides additional circumstantial evidence from which the Court may infer that Juliann was aware that

her representations were false at the time she made them.  When Michelle Westmoreland from

Flextronics contacted Juliann about the Flextronics Invoice in April, Juliann told Westmoreland it had

been sent by mistake and that Flextronics could "void out" the invoice rather than pay it.  Again, this

was in spite of the fact that Grove had already assigned the invoice to ARF who funded it.   Juliann made

no attempt to notify ARF that she had informed Flextronics that it owed no obligation on the Flextronics

Invoice.  Juliann was aware that ARF would not be receiving any payment on the Flextronics Invoice, and

she did nothing.  Given these circumstances, I infer that Juliann knew that the goods referenced in the

Flextronics Invoice had not been shipped at the time she falsely represented to ARF that they had been.

Further, I find that Juliann intentionally deceived ARF when she represented that the goods had been

shipped.

       With respect to the Arrow Invoices, Juliann signed and stamped the two invoices with the

representation that the Intel computer parts they referenced had been shipped.  Grove subsequently

shipped twenty units of the incorrect part and never shipped the parts requested.  Heather Martin, from

Arrow, made repeated attempts to contact Grove regarding the problem.  When she was unable to

reach anybody at Grove, she instructed Arrow's accounts payable department not to pay the invoices.

Juliann made no effort to contact Arrow regarding the undelivered goods, nor did she attempt to notify

ARF that they would not be receiving payment from Arrow.  Given these circumstances, I find that

Juliann knew that the goods referenced in the two Arrow Invoices had not been shipped when she

represented otherwise and that she intentionally deceived ARF in order to obtain funding on the

invoices.

       With regard to the remaining elements, I find that Juliann intended to induce ARF to rely on her

misrepresentations, that ARF actually and justifiably relied on Juliann's misrepresentations, and that ARF

suffered damages as a result of this reliance.  Juliann's misrepresentations were all made in the context

of the factoring arrangement under which ARF provided upfront payments to Grove in exchange for an

assignment of its receivables.  The Flextronics Invoice and the two Arrow Invoices were all submitted to

ARF for funding and Juliann's misrepresentations were all made while attempting to elicit upfront

payments from ARF with respect to these invoices.  Accordingly, I find that Juliann intended to induce

ARF to rely on her misrepresentations as it funded the invoices.  As set forth in the findings of fact

above, I have already found that ARF did actually rely on Juliann's representations that Grove had

shipped the LCD panels to Flextronics and the Intel computer parts to Arrow.  Moreover, I find that

ARF's reliance was justifiable as all three invoices were funded in the context of a broader factoring

arrangement under which ARF had funded numerous other Grove invoices, had obtained personal

guarantees from both Juliann and Brian, had taken a security interest in all Grove's receivables, and had

required submission of verifying documents with all invoices including purchase orders and shipping

receipts.  Accordingly, I find that the falsity of Juliann's representations was not readily apparent and

that ARF's reliance was justifiable.  Finally, there is no dispute that ARF actually funded all three invoices

and has not received any payment for the $102,690 Flextronics Invoice, the $19,700 First Arrow Invoice,

or the $9,850 Second Arrow Invoice, all of which were personally guaranteed by Juliann.  Accordingly, I

find that ARF suffered damages as a result of its reliance on Juliann's misrepresentations.

I conclude that any obligations owed to ARF on account of the advances made on the Flextronics

Invoice, the First Arrow Invoice, and the Second Arrow Invoice, whether contractual or tortious,

including attorney's fees and damages, are excepted from discharge under § 523(a)(2)(A).

### C.        11 U.S.C. § 523(a)(2)(B)

As false statements in writing respecting the debtor's or an insider's financial condition, ARF

only alleges the Flextronics Invoice, the First Arrow Invoice, and the Second Arrow Invoice.  As set forth

above, I have found that § 523(a)(2)(B) does not apply to these invoices.  Accordingly, I conclude that

ARF has failed to establish cause to except any of the above amounts from discharge under §

523(a)(2)(B).

### D.    11 U.S.C. § 523(a)(6)

#### i.    Applicable Law

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor

to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The requirements of this

exception are as follows:  The Plaintiff must show that the Debtor injured her or her property and that

the injury was both "willful" and "malicious."

"Willfulness" requires a showing of intent to injure or at least of intent to do an act which the

debtor is substantially certain will lead to the injury in question.  *Kawaauhau v. Geiger,* 523 U.S. 57, 118

S.Ct. 974, 140 L.Ed.2d 90 (1998).  "Malice" requires the injury to have been "wrongful," "without just

cause or excuse," and "committed in conscious disregard of one's duties."  *Printy v. Dean Witter*

*Reynolds, Inc.,* 110 F.3d 853, 859 (1st Cir.1997).  Malice thus has both objective and subjective elements:

the injury must have been objectively wrongful or lacking in just cause or excuse; and the debtor must

have inflicted the injury in "conscious disregard" of her duties, meaning that she has to have been aware

that the act was wrongful or lacking in just cause or excuse.  *Burke v. Neronha* (*In re Neronha*), 344 B.R.

229, 231–32 (Bankr. D. Mass. 2006).

#### ii.    Analysis

ARF alleges broadly that "[a]ll of the conduct of the Debtor adequately satisfies the

requirements of Section 523(a)(6), with regard to the Flextronics Invoice, the Arrow Invoices, and the

NEI Invoice."  The Court will address the 523(a)(6) count as to the specific debts that arose out of this

conduct, namely the debts pertaining to the Flextronics Invoice, the First Arrow Invoice, the Second

Arrow Invoice, and the NEI Invoice.

The first requirement is that the debtor's conduct caused injury to another entity or the

property of another entity.  This requirement is satisfied with respect to the Flextronics and Arrow

transactions in that Juliann induced ARF to advance funds to Grove in exchange for an assignment of

receivables which proved to be worthless.  The requirement is also satisfied with respect to the NEI

Invoice in that Juliann deposited funds that belonged to ARF into the Grove account and never

forwarded the funds to ARF.

The second requirement, that the injury have been willful, is also satisfied in that Juliann

intended to induce ARF to fund the Flextronics Invoice and the two Arrow Invoices with the knowledge

that ARF would not receive payment on these invoices.  As I have found above, Grove had not shipped

the Flextronics LCD panels nor had it shipped the Arrow Intel computer parts when Juliann made

representations to the contrary.  Additionally, as set forth above, I have inferred from the circumstances

that Juliann knew these representations to be false.  Given that Juliann knew that Grove had not met

the obligations giving rise to the rights to payment from Flextronics and Arrow, it follows that she also

knew that ARF would not receive payment on the corresponding invoices.  Juliann intended to, *and did*,

induce ARF to advance funds to Grove in exchange for invoices she knew to be uncollectible.  With

respect to the NEI invoice, Juliann intentionally deposited the funds from NEI into the Grove account

despite her knowledge that the NEI Invoice had been assigned to ARF and that the funds rightfully

belonged to ARF.

The third requirement, that the injury have been malicious, is also met.  Juliann induced ARF to

fund the Flextronics and Arrow invoices by means of false representations, with knowledge that her

representations were false, and with intent to deceive.  Therefore, Juliann's acts were objectively

wrongful, and she committed them with a subjective awareness of that wrongfulness.  Moreover,

Juliann deposited the NEI Invoice funds with knowledge that the funds belonged to ARF.  Accordingly,

this act was both objectively wrongful and committed with Juliann's subjective awareness of that

wrongfulness.

In sum, I conclude that any obligations owed to ARF on account of the advances made on the

Flextronics Invoice, the First Arrow Invoice, and the Second Arrow Invoices, whether contractual or

tortious, including attorney's fees and damages are excepted from discharge under §523(a)(6).  Further,

any obligation owed to ARF with respect to the NEI Invoice, whether contractual or tortious, including

attorney's fees and damages, is also excepted from discharge under § 523(a)(6).

E.      **11 U.S.C. § 727(a)(2)**

i.      **Applicable Law**

In relevant part, Section 727(a)(2)(A) provides that "the court shall grant the debtor a discharge,

unless [. . .] the debtor, with intent to hinder, delay, or defraud a creditor [. . .] has transferred,

removed, [. . .] or concealed, [. . .] property of the debtor, within one year before the date of the filing of

the petition."  11 U.S.C. § 727(a)(2)(A).  The First Circuit has ruled that four elements are required to

deny a discharge under § 727(a)(2)(A): "(1) transfer or concealment of property, (2) that belonged to the

debtor, (3) less than a year before the bankruptcy petition, (4) with actual intent to hinder, delay or

defraud a creditor." *Marrama v. Citizens Bank (In re Marrama),* 445 F.3d 518, 522 (1st Cir. BAP 2006);

*Groman v. Watman* (*In re Watman*), 301 F.3d 3, 7 (1st Cir. 2002).  To prevail on a complaint seeking

denial of discharge under § 727(a)(2)(A), the plaintiff must prove each element by a preponderance of

the evidence. *In re Barry*, 451 B.R. 654, 659; (1st Cir. BAP 2011); *Antognoni v. Basso (In re Basso),* 397

B.R. 556, 562 (1st Cir. BAP 2008).  "Transfer" means "each mode [. . .] of disposing of or parting with"

property or an interest therein.  *Watman*, 301 F.3d. at 10 (citation omitted).  "Concealment" can take

various forms.  These include (i) the debtor's withholding of information about an asset in which he or

she has an interest and that he or she is duty-bound to reveal and (ii) the debtor's ostensible transfer of

title to an asset coupled with his or her secret retention of the benefits of ownership.  *R.I. Depositors*

*Econ. Prot. Corp. v. Hayes (In re Hayes)*, 229 B.R. 253, 259 (B.A.P. 1st Cir. 1999) and cases cited.

Even if a transfer occurred more than a year before bankruptcy, it may still provide a basis for

objection to discharge if it operates as a concealment that continues in the year before bankruptcy.  *In*

*re Annunziata*, 2008 WL 410643, at *4-7 (Bankr. D. Mass. 2008), citing Collier, ¶ 727.02[b], at 727–14.

"The doctrine of continuing concealment states simply that '[c]oncealing property for purposes of

section 727(a)(2)(A) can be accomplished by a transfer of title coupled with the retention of the benefits

of ownership.'" *In re Charette*, 148 B.R. 94, 96 (Bankr. D. Mass. 1992), *quoting Olivier v. Thibodeaux* (*In

re Olivier*), 819 F.2d 550, 553 (5th Cir.1987).   Under the continuing concealment doctrine, transfers

performed prior to the one-year period may fall within the ambit of § 727(a)(2)(A) if the debtor has

retained a secret interest in the transferred property and has acted to conceal that interest during the

year immediately preceding bankruptcy. *In re Basso*, 397 B.R. at 562 (citations omitted).   Courts should

invoke the continuous concealment doctrine cautiously so as not to "short circuit" the § 727(a)(2)(A)

inquiry. *Id.* citing *In re Rowlands,* 346 B.R. 279, 283 (1st Cir. BAP 2006); *In re Hayes,* 229 B.R. at 260;

*Small v. Bottone* (*In re Bottone*)*,* 209 B.R. 257, 262 (Bankr. D. Mass. 1997).   The Bankruptcy Appellate

Panel has cautioned:   "Section 727(a)(2)(A) plaintiffs must prove that the requisite conduct,

accompanied by the requisite intent, actually took place within the year preceding the bankruptcy."

*Hayes*, 229 B.R. at 260.

Courts that have invoked the doctrine of continuing concealment have relied on the notion that

concealment requires that the debtor possess *some* interest in the property during the one-year period

prior to bankruptcy, even if that interest is merely a secret retention of the benefits of ownership.  *See,

e.g.*, *In re Hayes,* 229 B.R. at 260–61 (Court found that debtors retained "secret beneficial property

interest" during applicable period); *In re Annunziata*, 2008 WL 410643, at *6 (Court found that debtor

"retained a secret interest in the [property] within a year before the filing of his bankruptcy petition");

*Millbury Nat'l Bank v. Palumbo* (*In re Palumbo*)*,* 353 B.R. 37, 41 (Bankr. D. Mass. 2006) (In denying

debtor's motion for summary judgment, Court found that it was possible that debtor might have

retained benefits of ownership during relevant time period despite transferring title of the property); *In

re Bottone,* 209 B.R. at 262 (In denying debtor's motion for summary judgment, court found that legal

transfer does not preclude debtor's retention of a beneficial interest during the applicable time period).

"Continuous concealment" thus requires 1) an interest in property that continues into the period one year prior to bankruptcy, even if that interest is the mere retention of the benefits of ownership; and 2) an act by the debtor, during the one year period prior to bankruptcy, concealing that interest in property. *See In re Basso*, 397 B.R. at 562.

ii.      **Analysis**

ARF contends that Juliann should be denied a discharge under § 727(a)(2)(A) because of the actions she took to conceal the proceeds of the tax refund.  These actions include misleading the Superior Court as to her need for the funds, disposing of a substantial portion of the funds be means of the $51,431.49 check, failing to account for the $51,431.49 check in the Tax Refund Accounting she provided to the Chapter 7 Trustee in the Grove Bankruptcy Case, and evading the requests of counsel to ARF to explain the disposition of the funds.  Juliann filed her Chapter 7 petition on January 4, 2012.  ARF concedes that the alleged misrepresentations to the Superior Court and the disposition of the funds via the $51,431.49 check both occurred in September 2010, more than one year prior to the date Juliann filed her bankruptcy petition.  However, ARF alleges a continuing concealment of the tax refund proceeds that extended into the applicable time period.  ARF notes that Juliann's incomplete Tax Refund Accounting submitted to the Chapter 7 Trustee in the Grove Bankruptcy Case and her repeated evasions of ARF counsel's requests for an explanation as to disposition of the tax refund proceeds both occurred within the year prior to the date Juliann filed her petition.

ARF has provided evidence to show that Juliann received the tax refund totaling almost $100,000 in September 2010.  Additionally, ARF has provided evidence to show that over $51,000 of those funds were transferred from Juliann's personal bank account and that Juliann has been unwilling or unable to explain this transfer.  However, ARF has provided no evidence to show that Juliann possessed *any interest*, even a secret beneficial one, in the tax refund proceeds during the period one year prior to the filing of her petition.  Without such a showing, ARF cannot meet its burden of showing

concealment of an interest in property during the applicable time period, even under a theory of continuing concealment.

As explained above, continuing concealment requires 1) an interest in property that continues into the period one year prior to bankruptcy, even if that interest is the mere retention of the benefits of ownership; and 2) an act by the debtor, during the one year period prior to bankruptcy, concealing that interest in property. Juliann's inaccurate report to the Grove Chapter 7 Trustee, on February 28, 2011, might very well have constituted the necessary act of concealment within the applicable period if ARF had shown that Juliann had any interest to conceal. Additionally, Juliann's evasion of ARF counsel's repeated requests for an explanation as to the disposition of the funds might have constituted the required act of concealment. However, ARF has provided no evidence that in the year period prior to her own bankruptcy case, Juliann had any interest in any portion of the tax refund proceeds left to conceal. As the burden lies with ARF on this point, I find that ARF has failed to show that Juliann retained even a beneficial interest in the proceeds of the tax refund during the relevant time period. As noted above, cases that have denied a debtor's discharge under a continuing concealment theory have required evidence that the debtor have some interest, even a secret beneficial one, in the property during the year prior to bankruptcy. A debtor cannot conceal what she does not have. Juliann's unwillingness or inability to account for the missing funds may very well constitute grounds to deny her a discharge, as will be discussed below, but not under § 727(a)(2)(A). ARF has not provided sufficient evidence to show that Juliann had any interest in the property it accuses her of concealing during the applicable period. Accordingly, I find that ARF has failed to establish cause under § 727(a)(2)(A) to deny Juliann a discharge.

**F.        11 U.S.C. § 727(a)(5)**

**i.        Applicable Law**

Section 727(a)(5) provides that "the court shall grant the debtor a discharge, unless [. . .] the

debtor has failed to explain satisfactorily, before determination of denial of discharge under this

paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. §

727(a)(5). In *Aoki v. Atto Corp. (In re Aoki),* 323 B.R. 803 (B.A.P. 1st Cir.2005), the First Circuit Bankruptcy

Appellate Panel stated:

> Section 727(a)(5) is broadly drawn and gives the bankruptcy court broad power to
> decline to grant a discharge in bankruptcy when the debtor does not adequately explain
> a shortage, loss, or disappearance of assets. *See D'Agnese,* 86 F.3d at 734 (citing *First
> Fed. Life Ins. Co. v. Martin (In re Martin),* 698 F.2d 883, 886 (7th Cir.1983)).
>
> Under § 727(a)(5), a plaintiff must establish: (1) that the debtors have experienced a
> loss of assets or deficiency of assets; and (2) that the debtors cannot provide a
> satisfactory explanation for such loss. *See* Lawrence P. King, 6 Collier on Bankruptcy ¶
> 727.08 (15th ed. rev.2002).
>
> There are two stages of proof with respect to this section. The plaintiff has the initial
> burden of producing some evidence that the debtor no longer has assets which he
> previously owned. *See Ehle v. Brien (In re Brien),* 208 B.R. 255, 258 (1st Cir. BAP 1997).
> Once the plaintiff has established the loss of an asset, it is up to the debtor to provide a
> satisfactory explanation for the loss or deficiency of the asset. *Krohn v. Cromer (In re
> Cromer),* 214 B.R. 86, 95 (Bankr.E.D.N.Y.1997).

*In re Aoki,* 323 B.R. at 817.

The plaintiff must also show that the debtor has been called upon to explain the loss in

question, in the adversary proceeding itself if not before. *See M & I Heat Transfer Products v. Gorchev*

*(In re Gorchev),* 275 B.R. 154 (Bankr.D.Mass.2002).  There is no generally applicable requirement, in the

Bankruptcy Code or the Statement of Financial Affairs, that debtors explain their losses or insolvency.  A

debtor may be denied a discharge for failure to explain a particular loss satisfactorily, but only if the

debtor was first called upon to make an explanation. *Marina Harbor II Corp. v. Joselin* (*In re Joslin*), 499

B.R. 47, 54 (Bankr. D. Mass. 2013)

Addressing the issue of the debtor's burden to provide a satisfactory explanation once the plaintiff has introduced some evidence of disappearance of substantial assets, the Panel in *Aoki v. Atto Corp.* explained:

> What constitutes a "satisfactory" explanation for § 727(a)(5) purposes is left to the discretion of the court. *See Baum v. Earl Millikin, Inc.,* 359 F.2d 811, 814 (7th Cir.1966). In determining whether to grant a discharge under § 727(a)(5), a court is interested in what happened to a debtor's assets and not in the wisdom of the debtor's disposition of the assets. *See id.* Moreover, unlike § 727(a)(2)(A), there is no requirement under § 727(a)(5) that a debtor act fraudulently or intentionally. *See Cromer,* 214 B.R. at 95.
>
> A debtor's explanation need not be comprehensive, but it must meet two criteria: First, it must be supported by at least some corroboration. *See, e.g., Wortman v. Ridley (In re Ridley),* 115 B.R. 731, 737 (Bankr.D.Mass.1990) (undocumented explanations are not satisfactory for § 727(a)(5) purposes) (citing *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616 (11th Cir.1984); First *Tex. Sav. Ass'n v. Reed (In re Reed),* 700 F.2d 986 (5th Cir.1983)). Second, the corroboration must be sufficient to eliminate the need for any speculation as to what happened to all of the assets. *Id.* A debtor's explanation must consist of more than "vague or indefinite references, evidence or explanations, or an uncorroborated hodgepodge of financial transactions." *Id.* (citations omitted). "A jumble of vague, unassorted memoranda, checks, bank statements, and bills" is insufficient. *Id.* at 738 (citing *Jackson v. Menick,* 271 F.2d 806, 809 (9th Cir.1959)). Therefore, discharge will be denied when a debtor makes only a vague evidentiary showing that the missing assets involved have been used to pay unspecified creditors, or where the debtor fails to provide corroborative documentary evidence to confirm his explanation. *Id.* at 737–38 (citations omitted).

*In re Aoki,* 323 B.R. at 817–18.

### ii.      Analysis

ARF alleges that Juliann has failed to explain the loss or deficiency of various funds comprising the proceeds of the tax refund. Specifically, ARF alleges that Juliann has failed to explain the disposition of the $51,431.49 check issued from her personal bank account on September 23, 2014.

ARF has met its initial burden of providing some evidence of the loss of an asset. ARF has introduced evidence that reveals that Juliann and Brian received a tax refund of approximately $100,000 in September 2010 and that those funds were deposited into Juliann's personal bank account. Further, ARF introduced into evidence Juliann's bank statement which reveals that the $51,431.49 check was written from Juliann's bank account during September 2010. Additionally, ARF has introduced into

evidence the Tax Refund Accounting which Juliann produced in the Grove Bankruptcy Case.  This

document which purports to detail the disposition of the tax refund proceeds fails to account for the

check in question.

ARF has also demonstrated that Juliann has been called upon to explain the loss in question.  For

one, the Chapter 7 Trustee in the Grove Bankruptcy Case asked Juliann to provide an accounting of the

disposition of the tax return proceeds.  Additionally, ARF requested a copy of the unaccounted for check

during discovery.  Furthermore, Juliann was asked by ARF's counsel both during a deposition and at trial

in this adversary proceeding to explain the disposition of the missing check.

ARF having met its initial burden, the burden shifts to Juliann to provide a satisfactory

explanation as to the disposition of these funds.  Juliann does not only fail to provide a satisfactory

explanation, she offers no explanation whatsoever.  When the Chapter 7 Trustee in the Grove

Bankruptcy Case asked for an accounting of the tax refund proceeds, Juliann created a detailed

spreadsheet that failed to account for the $51,431.49 check.  When ARF requested a copy of the

canceled check, Julian responded in writing that she did not have it.  When questioned at a deposition

by ARF's counsel as to the disposition of the check, Juliann provided no explanation.   When questioned

at trial by ARF's counsel regarding the $51,431.49 check, Juliann again provided no explanation,

testifying as follows:

Q.      And today, you still don't know what the money was for, correct?

A.      No, I don't off –

Q.      Okay.

A.      Today I don't know.

The Court finds that Juliann has failed to satisfactorily explain her loss of assets, namely the

$51,431.49 check constituting a portion of the proceeds of the tax return.  Juliann need not provide a

comprehensive explanation as to the disposition of these funds, but she needs to provide *some*

explanation supported by sufficient corroboration.  She is obligated to explain where the money went,

and she has made no attempt to do so.  Accordingly, I find that ARF has established cause under §

727(a)(5) to deny Juliann a discharge. [1]

**IV.       Conclusion**

For the reasons set forth above, the court will enter a separate judgment denying Juliann a

discharge under § 727(a)(5).   The judgment will also declare that should any discharge enter,

notwithstanding this Court's denial of Juliann's discharge, any obligations owed to ARF with respect to

above discussed transactions, whether contractual or tortious, including attorney's fees and damages,

are excepted from discharge.

Date:  December 17, 2014                                          _____
                                                                 Frank J. Bailey
                                                                 United States Bankruptcy Judge

---

[1] ARF also alleges that grounds exist to deny Juliann a discharge under § 727(a)(5) based on Juliann's failure to
account for an additional $7,500 check issued from her personal bank account on September 24, 2010.  As I have
already found grounds to deny Juliann a discharge under 727(a)(5), I decline to reach this issue.